Filed 5/16/22  Mitracos v. City of Tracy CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| MARY MITRACOS, | C093383 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CV-UWM-2018-0005531) |
| v. | |
| CITY OF TRACY, | |
| Defendant and Appellant; | |
| SURLAND COMMUNITIES, LLC, | |
| Real Party in Interest and Appellant. | |

Defendant City of Tracy and real party in interest Surland Communities, LLC (Surland) jointly appeal from the judgment on plaintiff Mary Mitracos' petition for writ of mandate ordering the city to vacate and set aside the adoption and approval of the "Second Amendment to Amended and Restated Development Agreement" between the city and Surland (hereafter the Second Amendment).

The city and Surland contend that the judgment should be reversed, because (1) the trial court wrongly found that sections 1.07(b)(ii) and 1.07(h) of the Second Amendment, allowing property to be added to the city's development agreement with Surland, violated Government Code sections 65865, subdivision (a), and 65865.2;[1] and (2) the court should have severed sections 1.07(b)(ii) and 1.07(h), rather than invalidating the entire Second Amendment.

We will remand to the trial court to determine the amount of attorney fees Mitracos reasonably incurred defending against this appeal. We will otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2009, the city recorded a development agreement with Surland. Under the vested rights provisions of the agreement, the city's land use "rules, regulations, ordinances, policies, standards, specifications, practices and standard operating procedures" relating to Surland's development of property in the Ellis Specific Plan area were frozen as of December 1, 2008. In return, Surland committed to provide $10 million towards design, maintenance, operation and construction of a local community swim center and to offer to dedicate up to 16 acres for the swim center site. The term of the agreement was 25 years.

---

[1] Government Code section 65865, subdivision (a), provides: "Any city, county, or city and county, may enter into a development agreement with any person having a legal or equitable interest in real property for the development of the property as provided in this article."

Government Code section 65865.2 provides in relevant part: "A development agreement shall specify the duration of the agreement, the permitted uses of the property, the density or intensity of use, the maximum height and size of proposed buildings, and provisions for reservation or dedication of land for public purposes."

All undesignated statutory references are to the Government Code.

The agreement further provided that Surland was eligible to receive 2,250 "Residential Growth Allotments" (RGAs) from the city. An RGA, as defined by the city's Growth Management Ordinance, "is an allotment made by the City . . . which must be obtained by a developer . . . before each residential building permit is issued by the City . . . . One RGA is required for each dwelling unit to be constructed." (Tracy Mun. Code, ch. 10.12, § 10.12.030.) The first 500 RGAs were dedicated to development within the Ellis Specific Plan area.[2] All remaining RGAs could be used within the Ellis Specific Plan area or applied to other Surland-owned property authorized for development. The agreement required that "[a]s to all property . . . Owner [Surland] must have a legal or equitable interest in such property before this Agreement can be recorded against such property."

On October 31, 2011, the trial court issued a statement of decision on a petition for writ of mandate filed by the Tracy Region Alliance for a Quality Community to enjoin the city from proceeding under the 2009 development agreement. The court found that (1) "the Development Agreement in this case is a reservation of future development rights for Surland . . . contrary to the plain language and objectives of Section 65865(a)"; and (2) the agreement applied to property outside the Ellis Specific Plan area, thus "there can be no reference to existing regulations or zoning ordinances which can satisfy the requirements of Government Code § 65865.2."

In 2013, the city recorded an "Amended and Restated Development Agreement" with Surland (hereafter the 2013 DA). The 2013 DA provided that the 2,250 RGAs that Surland was eligible to apply for and potentially receive were for development of all the property within the Ellis Specific Plan area that Surland owned or had enforceable contracts to purchase.

_____

[2]     At the time, Surland did not own all the property in the Ellis Specific Plan area.

3

On May 18, 2018, the city recorded the Second Amendment to the 2013 DA.[3] Under the Second Amendment, Surland would assume an increased obligation to design and construct the swim center and the city would adopt a process for Surland to apply for and the city to approve the addition of property subject to the 2013 DA. Section 1.07(b)(ii) of the Second Amendment provided in relevant part: "This amendment is designed to permit additional property to be added to and incorporated in to the Development Agreement and therefore become Property of the Development Agreement, and Owner [Surland] may apply for RGAs for Projects and home builders within the Property (whether or not annexed to the [Ellis Specific Plan]) area. Owner shall not apply RGAs subject to this Agreement to other real property unless this property has been added to the Development Agreement as Property pursuant to subsection 1.07(h)."

Section 1.07(h) gave Surland the right to request approval from the city to record the development agreement against additional property if: (1) the property "has been annexed" to the city; (2) Surland has an enforceable right to purchase the property "within the meaning of 'legal and equitable interest in real property' as used in current Government Code Section 65865(a)"; (3) Surland agrees to annex the property into the Ellis Specific Plan owners' association, finance district and finance plan; (4) the development agreement as amended or modified includes a description of the property; and (5) the city adopts a finding that the property description is not inconsistent with the city's Growth Management Ordinance in the form that existed on the effective date of the 2013 DA.

On May 11, 2018, Mitracos filed a petition for writ of mandate and complaint for declaratory relief against the city, naming Surland as real party in interest, alleging that

---

[3]    The first amendment to the 2013 DA extended the time (1) for Surland to make the first installment payment to fund the swim center, and (2) for the city to accept Surland's land dedication offer.

the Second Amendment violated sections 65865, subdivision (a), and 65865.2 and was therefore void.[4] Surland and the city filed answers to the petition and the parties submitted a brief. The matter proceeded to a court trial, essentially a writ hearing, which was not reported. Mitracos requested a statement of decision.

In the statement of decision, the court found the Second Amendment "could be recorded against and currently allocated Residential Growth Allotments applied to real property in which [Surland] has no 'legal or equitable interest' " as required by section 65865. The court further found "that the fact the 2018 amendments allow for the annexation of Real Party's after acquired property, and the application of allotted RGAs only upon city council action does not meet the Government Code requirements which exist at the inception of Development Agreements." The court also found that the Second Amendment did not meet the requirements of section 65865.2 as it "allows RGAs to be used on other unknown projects and unknown parcels which may or may not have the Ellis Specific Plan design and planning standards for all infrastructure and site improvements."

The court entered judgment finding that the city committed a prejudicial abuse of discretion in adopting the Second Amendment, which did not comply with sections 65865, subdivision (a), and 65865.2, and was therefore void, and ordering the city to set aside, rescind and vacate the Second Amendment and ordinance adopting it.

The city and Surland moved for a new trial, or, in the alternative, to set aside and vacate the judgment and enter a new and different judgment. The trial court failed to rule on the motion within the statutorily prescribed time, resulting in its denial by operation of

---

[4]    Mitracos also alleged a claim for civil contempt, contending that the city and Surland willfully disobeyed the trial court's 2011 order by entering into and implementing the Second Amendment. The city and Surland have not appealed the trial court's rulings on contempt.

5

law.  (*Hersey v. Vopava* (2019) 38 Cal.App.5th 792, 797, fn. 2; Code Civ. Proc., §§ 660, subd. (c), 663a, subd. (b).)

The city and Surland filed timely appeals.

## DISCUSSION

### I

### *Section 68685*

The city and Surland contend that the trial court's interpretation of sections 1.07(b)(ii) and 1.07(h) of the Second Amendment as violating section 65865 is incorrect. We disagree.

The standard of review we apply in reviewing the validity of a development agreement is in fact two standards of review, as the court explained in *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221 (*Santa Margarita*):  "A development agreement is a legislative act (§ 65867.5) and [the city] has the discretion to determine what legislation is necessary and appropriate.  A reviewing court will not set aside a legislative act unless it is arbitrary, capricious, or unlawful.  [Citations.]  On the other hand, courts independently decide purely legal issues such as statutory interpretation." (*Id*. at pp. 227-228.)  Thus, a court reviews a development agreement "to determine if it enlarges or impairs the terms of the authorizing statute without deference" to the local legislative body.  (*Id*. at p. 228.)

The city and Surland argue that the Second Amendment did not violate section 65865, subdivision (a), because (1) section 1.07(b)(ii) of the Second Amendment only allows property to be added to the 2013 DA if Surland owns or has an enforceable right to purchase property within the meaning of the " 'legal and equitable interest in real property' " language in section 65865, and (2) section 1.07(h)(iv) of the Second Amendment requires that the 2013 DA contain an amended description of property subject to the agreement that includes the newly added property.  The city and Surland

6

argue that sections 1.07(b)(ii) and 1.07(h) were drafted to address the issues that prompted invalidation of the 2009 development agreement.

However, the 2009 development agreement also contained a provision requiring Surland to have an interest in newly acquired property that complied with section 65865, subdivision (a). The difference between the 2009 development agreement and the Second Amendment to the 2013 DA is only that the latter requires amendment of the property description. The city and Surland deem this requirement to mandate an amendment of the 2013 DA under section 65868.[5] The 2013 DA states: "This Agreement may be amended from time to time in accordance with California Government Code section 65868 . . . ."

An amendment requirement does not obviate the core problem under section 65865, subdivision (a), the Second Amendment, which gives Surland vested rights as of the effective date of the 2013 DA for property Surland might acquire in the future. This is not permissible under section 65865, subdivision (a), nor is it consistent with the purpose of the development agreement statute.

In *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435 (*Mammoth Lakes*), we summarized the history and purpose of the development agreement statute: "A development agreement is a statutorily authorized agreement between a municipal government . . . and a property owner for the

---

[5] Section 65868 provides: "A development agreement may be amended, or canceled in whole or in part, by mutual consent of the parties to the agreement or their successors in interest. Notice of intention to amend or cancel any portion of the agreement shall be given in the manner provided by Section 65867. An amendment to an agreement shall be subject to the provisions of Section 65867.5." Section 65867 requires public notice and hearing by the local government planning commission and legislative body on a proposal to adopt a development agreement. Section 65867.5, subdivision (a) provides: "A development agreement is a legislative act that shall be approved by ordinance and is subject to referendum."

7

development of the property.  (Gov. Code, § 65865, subd. (a).)  One of the main components of a development agreement is a provision freezing the municipality's rules, regulations, and policies governing permitted uses of land and density of the land use, as well as standards and specifications for design, improvement, and construction.  (Gov. Code, § 65866.)  This provision allows a developer to make long-term plans for development without risking future changes in the municipality's land use rules, regulations, and policies." (*Id.* at p. 442, citing *Santa Margarita, supra*, 84 Cal.App.4th at p. 227.)

"The Legislature enacted the development agreement statutes in response to the California Supreme Court's jurisprudence on vested rights.  [¶]  Before 1976, developers in California faced changes in land use laws and policies during the course of long-term development of property.  When a change in the land use laws and policies interfered with development already initiated, some developers argued that they had a 'vested right' to complete the development despite the changes in the land use laws and policies." (*Mammoth Lakes, supra*, 191 Cal.App.4th at p. 443, citing *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 791.)  "In 1976, the California Supreme Court, in *Avco,* decided that no right to complete the work vested until the developer obtained a building permit, even if the developer had already performed substantial work and incurred substantial liabilities on the project." (*Mammoth Lakes*, at p. 443, citing *Avco*, at p. 793.)

"In 1979, the Legislature's enactment of the development agreement statutes provided a way for the municipality and developer to depart from the common law rule of vested rights." (*Mammoth Lakes, supra*, 191 Cal.App.4th at p. 443.)  "The agreements allowed the developer to proceed with a project with the assurance that the project would be approved based on rules, regulations, and policies existing at the time the development agreement was approved, even if those rules, regulations, and policies changed over the course of the development project.  (Gov. Code, § 65864, subd. (b).)" (*Ibid.*)

8

In sum, under the development agreement statute, a municipality could contractually assure a developer embarking on a long-term development project that local land use regulations and standards would not change before the developer completed the project. (See *Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199, 1213 (*Citizens for Responsible Government*) ["Development agreements are creatures of legislation intended to provide developers with an assurance of their right to carry a project to completion and for which they need to make initial commitments"]; *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1013 ["the main purpose of a development agreement is to freeze existing regulations in order to give the developer assurance that the project will not be blocked by future regulatory changes"]; *North Murrieta Community, LLC v. City of Murrieta* (2020) 50 Cal.App.5th 31, 41 ["entering a development agreement allows a builder to rely on the regulations, conditions, and fees that exist at the planning stage when assessing the economics of completing a development that may take years or even decades to complete"]; Sigg, *California's Development Agreement Statute* (1985) 15 Sw.U. L.Rev. 695, 707 ["Development agreements grant builders a critical benefit which the traditional vested rights rule withheld:  they allow a builder to acquire by contract the equivalent of a vested right at an early stage of the project"].)

The language of section 65865, subdivision (a), reflects the Legislature's intent to allow a municipality to enter into an agreement to freeze land use regulations for a developer to complete a project:  "Any city, county, or city and county, may enter into a development agreement with any person *having a legal or equitable interest in real property for the development of the property* as provided in this article."  (§ 65865, subd. (a), italics added.)  The statute speaks in terms of a developer "having" an interest in "the" real property at the inception of the development agreement.  It is axiomatic that our primary task in interpreting the development agreement statute, as with any statute, is to determine the Legislature's intent, giving effect to the statutory purpose, of which the

9

words of the statute are the most reliable indicator. (*Center for Community Action & Environmental Justice v. City of Moreno Valley* (2018) 26 Cal.App.5th 689, 698 (*Center for Community Action*).)

The Legislature's declaration in section 65864, subdivision (b), underscores that the purpose of the statute is to facilitate completion of development projects: "The Legislature finds and declares that: [¶] . . . (b) Assurance to the applicant for a development project that upon approval of the project, the applicant may proceed with the project in accordance with existing policies, rules and regulations, and subject to conditions of approval, will strengthen the public planning process, encourage private participation in comprehensive planning, and reduce the economic costs of development." (§ 65864, subd. (b); see also Sigg, *supra*, 15 Sw.U. L.Rev. at p. 708 ["Perhaps the primary attraction development agreements hold for builders is their potential for reducing the uncertainty over whether the builder will be able to complete a large-scale project"].)

In service of the statutory objective to facilitate completion of projects, section 65865, subdivision (a), imposes the threshold requirement that the developer actually have a legal or equitable interest in the property to be developed. Put another way, the statute is not designed to facilitate development speculation.

The amendment provisions of the development agreement statutes do not alter or expand the limited purpose of the statutes to freeze land use regulation for a developer to complete a project. The city and Surland argue that "sections 65867.5(a) and 65868 . . . authorize cities to amend development agreements via duly-adopted ordinance, *without any limitation on the nature and scope of the amendment*." Not so. While these statutes are content neutral, describing only the parties' ability to amend the agreement by mutual consent and the process to do so, that does not mean a municipality has free rein to do by amendment what it cannot do in the initial agreement in compliance with section 65865, subdivision (a). The provisions of the development agreement statutes must be

10

interpreted " 'consistent with the purpose of the statute and statutory framework.' " (*Center for Community Action, supra*, 26 Cal.App.5th at p. 698.) The limitation imposed by section 65865, subdivision (a), applies equally to an amendment under section 65868 as to the initial agreement.

Both sides cite *National Parks & Conservation Assn. v. County of Riverside* (1996) 42 Cal.App.4th 1505 (*National Parks*), in support of their respective positions. In *National Parks*, the court upheld the validity of a development agreement where the developer did not have fee title to all of the land under the agreement. (*Id.* at p. 1521.) The city and Surland argue *National Parks* concluded that a development agreement is consistent with section 65865, subdivision (a), if " 'it does not bind the use of the land unless and until the land transfer is accomplished,' " quoting *National Parks*, at page 1523. Mitracos argues that, "[i]n *National Parks*, the [development agreement] was *NOT* effective until the developer identified the property to be included and acquired an interest in all of that property. [Citation.] In *National Parks* there was no [development agreement] and no vested rights conveyed to any property until those conditions precedent occurred." Mitracos has the better argument.

In *National Parks*, the challenger to a development agreement between a developer proposing to site a landfill in a former mine and the county contended that the former could not enter into the agreement, because part of the landfill site was owned by the federal Bureau of Land Management (BLM), which had agreed to a land exchange that had yet to be completed. (*National Parks, supra*, 42 Cal.App.4th at p. 1512.) The trial court held that the development agreement was valid under section 65865, subdivision (a), because the agreement by its terms would not become effective until the developer acquired a fee interest in the BLM property, the developer already owned the bulk of the land, and it was reasonably foreseeable the developer would acquire the BLM land. (*National Parks*, at p. 1513.) The appellate court agreed. The development agreement expressly provided that it was not effective until the developer acquired fee

11

interest in the BLM property. (*Id.* at p. 1521.) The court observed: "The record shows the County has a policy not to execute development agreements until the developer has the requisite interest in the land. The condition of [the developer] acquiring the fee interest in the property was required by the County to comply with the terms of the Government Code section 65865, subdivision (a)." (*Ibid.*)

There is no similar delay in the effective date of the 2013 DA under the Second Amendment. Surland did not need to acquire fee title, or any other legal or equitable interest, in land to be added to the 2013 DA for the agreement to become effective. Under the Second Amendment, the 2013 DA was immediately effective and recorded as of March 2013, giving Surland vested rights for property that Surland had not acquired, was not in the process of acquiring, or had even identified.

We conclude the Second Amendment was not in compliance with section 65865, subdivision (a), and the city abused its discretion in adopting the ordinance approving the Second Amendment.

II

*Section 65865.2*

Section 65865.2 "identifies the necessary terms in a development agreement, including duration, permitted uses, density of development, size of buildings and dedication of land for public purposes." (*Citizens to Enforce CEQA v. City of Rohnert Park* (2005) 131 Cal.App.4th 1594, 1599; see *Citizens for Responsible Government, supra*, 56 Cal.App.4th at p. 1214.)

The 2013 DA states that it complies with the requirements of section 65865.2: "The duration of this Agreement is set forth in Section 1.06 of this Agreement, and this Agreement sets forth provisions for the permitted uses, the density and intensity of use, the maximum height and size of proposed buildings, and the dedication of land for public purposes in the Applicable Law provisions of this Agreement, either by its terms or through its incorporation of the General Plan and the 2013 Ellis Specific Plan."

The Second Amendment states that Surland "intends to annex to the Ellis Property Owners Association all real property which is subsequently subject to the Development Agreement," and "such other real property *may* adopt the Ellis Specific Plan design and planning standards for all infrastructure and site improvements." (Italics added.)

Thus, with respect to property added to the 2013 DA, the Second Amendment does not set forth the permitted uses, density of development, and size of buildings mandated by section 65865.2 for property subject to the development agreement. In effect, no standards were specified for after-acquired property but only an intention to consider the Ellis Specific Plan specifications. The Second Amendment thus does not comply with section 65865.2.

The city and Surland argue that the section 65865.2 compliance issue is not ripe because no additional property has been acquired by Surland and added to the 2013 DA by the process set forth in sections 1.07(b)(ii) and 1.07(h) of the Second Amendment. We disagree. Whether a development agreement contains required terms is an issue ripe for decision at the time the agreement was adopted. (See *Trancas Property Owners Assn. v. City of Malibu* (2006) 138 Cal.App.4th 172, 182-183 [rejecting the argument that agreement between the city and developer exempting development from compliance with zoning density restrictions was not ripe for review because the development had yet to occur, as the city "has already made impermissible promises and commitments"].)

The city and Surland also claim that the city is entitled to a presumption that an amendment to the property description of the 2013 DA under sections 1.07(b)(ii) and 1.07(h) of the Second Amendment will comply with section 65865.2. "Amendments to development agreements are subject to the provisions of Government Code section 65867.5. (Gov. Code, § 65868.) Legislative enactments such as these 'are presumed to be valid; to overcome this presumption the petitioner must bring forth evidence compelling the conclusion that the ordinance is unreasonable and invalid.' [Citation.]" (*Citizens for Amending Proposition L v. City of Pomona* (2018) 28 Cal.App.5th 1159,

13

1187.) We have already concluded sections 1.07(b)(ii) and 1.07(h) of the Second Amendment are not in compliance with section 65865 and the city abused its discretion in adopting the ordinance approving the Second Amendment. Any presumption of validity has been overcome. (See *Citizens for Amending Proposition L*, at p. 1187 [evidence that city ordinance and contract it authorized violated Prop. L prohibiting new or structurally altered billboards overcame presumption of validity].)

We conclude that the Second Amendment did not comply with the mandatory requirements of section 65865.2 and, for this reason as well, the city abused its discretion in approving the Second Amendment.

### III

#### *Severance*

The city and Surland contend that, "[a]ssuming, *arguendo*, the challenged provisions of the Second Amendment are unlawful, the trial court committed prejudicial error by rejecting Appellant's argument that they should be severed," and "invalidating the entirety of the City's legislative approval and the Second Amendment." They argue that the trial court should have severed sections 1.07(b)(ii) and 1.07(h) for three reasons: "(1) Mitracos failed to exhaust administrative remedies as to the other sections; (2) the overbroad ruling violates the separation of powers doctrine; and (3) Sections 1.07(b)(ii) and (h) are severable from the remainder of the Second Amendment and 2013 DA."

In fact, the trial court did not reject the severance argument. Rather, the court simply did not address severance in the statement of decision because it was not raised in the answers Surland and the city filed or their brief in opposition to the petition. The city and Surland first proposed severance in a footnote in their objections to the proposed statement of decision and then again in their motion for new trial.

We conclude that the city and Surland have forfeited the severance issue on appeal. The trial court was not obligated to address objections to the proposed statement of decision premised on new arguments not litigated in the case. (*Starcevic v. Pentech*

14

*Financial Services, Inc.* (2021) 66 Cal.App.5th 365, 382; *Colony Ins. Co. v. Crusader Ins. Co.* (2010) 188 Cal.App.4th 743, 750 ["A statement of decision . . . covers only issues litigated in the case"].) Nor is this court. " 'It is a firmly entrenched principle of appellate practice that litigants must adhere to the theory on which a case was tried.' [Citation.]" (*Colony*, at p. 751.)

A motion for a new trial is also not a vehicle to preserve new theories for appeal. (See *Insurance Co. of State of Pennsylvania v. American Safety Indemnity Co.* (2019) 32 Cal.App.5th 898, 922 ["New theories that could have been raised, but were not, is not one of the causes that permits a new trial"]; *Green v. Healthcare Services, Inc.* (2021) 68 Cal.App.5th 407, 419 [" 'Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider . . . . Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier' "].)

Moreover, "[w]hether a contract is severable is 'equitable and fact specific, and its application is appropriately directed to the sound discretion of the . . . trial courts in the first instance.' [Citation.] Accordingly, it cannot be raised for the first time on appeal . . . ." (*In re Acknowledgment Cases* (2015) 239 Cal.App.4th 1498, 1509, quoting *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 998 (*Marathon*); see also *Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1149.)

In their reply brief, the city and Surland counter "the Court should consider the severance issue regardless of the timing at which it was raised below," because "[i]t is well established that pure questions of law based on undisputed facts may be raised for the first time on appeal." The city and Surland argue two of their severance arguments involve "pure questions of law," i.e., (1) violation of the separation of powers doctrine based on the contents of the writ and the Second Amendment, and (2) contract law severance based on the language of the Second Amendment. While this court has

15

discretion "to consider forfeited arguments that raise pure questions of law," it has no mandatory duty to do so. (*Wittenberg v. Bornstein* (2020) 51 Cal.App.5th 556, 567; *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 700.) Assuming, for argument's sake, that these are pure questions of law, neither separation of powers principles nor contract law require severance.

Regarding separation of powers, the city and Surland argue that trial court violated separation of powers by interfering with legislative action, i.e., by ordering the city to rescind the ordinance approving the Second Amendment "when the less invasive remedy of invalidating or voiding the ordinance, to the extent it violates the law, is available." (*City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1310 [" 'Generally, a court is without power to interfere with purely legislative action, in the sense that it may not command or prohibit legislative acts, whether the act contemplated or done be at the state level [citation] or the local level [citation]. The reason for this is a fundamental one—it would violate the basic constitutional concept of the separation of powers among the three coequal branches of the government' "].) They assert "the trial court should have voided and severed Sections 1.07(b)(ii) and (h) from the Second Amendment . . . ." We conclude that these provisions do not meet the ultimate determination of severability that the city council still would have adopted the remainder of Second Amendment had it foreseen that these provisions would be invalidated.

"If an invalid provision of an initiative or ordinance is severable, it is stricken from the ordinance and the remaining provisions are given effect. [Citations.] When the ordinance contains a severability clause, an invalid provision is severable if it is grammatically, functionally, and volitionally separable. [Citations.] 'An enactment passes the grammatical test " 'where the language of the statute is mechanically severable, that is, where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase, or even single words. [Citations.].' " [Citation.]' [Citation.] A provision is functionally severable if it is 'capable of independent application. In order to

16

pass this test "[t]he remaining provisions must stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to them by policy considerations." [Citation.]' [Citations.] The volitional requirement for severability is met if the voters [or legislative body] likely would have adopted the initiative without the invalid provisions. [Citations.]" (*MHC Financing Limited Partnership Two v. City of Santee* (2005) 125 Cal.App.4th 1372, 1393; see also *Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 770 [" ' "Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable. . . . The final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable" ' "].)

Neither Ordinance No. 1253 approving the Second Amendment, nor the Second Amendment itself, contain a severability clause. The 2013 DA, however, does.[6] Assuming, for argument's sake, that this clause is applicable, it is highly questionable whether the city council would have even been afforded the opportunity to adopt an ordinance approving an amendment that required Surland to build the swim center, if the parties foresaw that sections 1.07(b)(ii) and 1.07(h) would be invalidated. The Second Amendment was a trade-off of a very substantial increase in Surland's commitment to

---

**6**     The 2013 DA states: "Should any part, term or provision of this Agreement or any document required herein to be executed or delivered be declared invalid, void or unenforceable, all remaining parts, terms and provisions hereof shall remain in full force and effect and shall no way be invalidated, impaired or affected thereby."

17

build the swim center for vested rights for development of property yet to be acquired.[7] The Second Amendment expressly stated that its purpose was "to expand the scope of the proposed Development Agreement amendment to provide for Owner [Surland] to assume the obligation to design and construct the proposed Swim Center, and to describe a process by which other real property could become subject to the Development Agreement . . . ." Surland agreed to design and construct the swim center and increase its funding commitment to $35 million, over and above the $8 million second installment payment required by the 2013 DA, plus a contingency fund of up to 20 percent of the $45 million total estimated costs to complete the center. In return, Surland received vested rights to add property to the 2013 DA and use the RGAs allocated in the 2013 DA outside the Ellis Specific Plan property. To be sure, Surland has joined with the city in advocating severance on appeal, but the notion that Surland intends to undertake a more than four-fold increase in expense to build the swim center without the vested rights conferred by sections 1.07(b)(ii) and 1.07(h) is inconsistent with the fundamental structure of the Second Amendment.

Application of contract law severance principles yields the same result for a similar reason: the vested rights illegal under the statute are central to the agreement. " ' "Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can

---

[7] "In 1984, the Legislature added a declaration that development agreements would also allow municipalities to extract promises from the developers concerning financing and construction of necessary infrastructure." (*Mammoth Lakes, supra*, 191 Cal.App.4th at pp. 443-444; see also Miller & Starr, Cal. Real Estate (4th ed. 2021) § 21:29 ["In effect, the public entity agrees to 'freeze' the zoning, planning, and other ordinances applicable to the property and allow development to proceed under the then-existing laws and ordinances, and in exchange the public entity may bargain for financial and other concessions and public benefits from the developer parties"].)

18

be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." ' " (*Koenig v. Warner Unified School Dist.* (2019) 41 Cal.App.5th 43, 56 (*Koenig*), quoting *Marathon, supra*, 42 Cal.4th at p. 996.)

Here, " ' "the central purpose of the contract is tainted with illegality." ' " (*Koenig, supra*, 41 Cal.App.5th at p. 56.) The exchange of design and construction services and increased funding for the swim center from Surland in return for vested rights to add property to the 2013 DA and to use RGAs outside the Ellis Specific Plan area constitutes the central purpose of the Second Amendment. Indeed, the Second Amendment states: "This amendment is *designed* to permit additional property to be added to and incorporated in to the Development Agreement and therefore become Property of the Development Agreement, and Owner [Surland] may apply for RGAs for Projects and home builders within the Property (whether or not annexed to the [Ellis Specific Plan]) area." (Italics added.) Thus, the central purpose of the Second Amendment, and the consideration Surland received under the amendment, were illegal under sections 65865 and 65865.2. Accordingly, the Second Amendment was not severable.

IV

*Attorney Fees Incurred on Appeal*

In the statement of decision, the trial court determined that Mitracos should recover attorney fees under Code of Civil Procedure section 1021.5. Mitracos contends she is also entitled to recover attorney fees connected with this appeal under the same statute.

"When a contract or a statute authorizes the prevailing party to recover attorney fees, that party is entitled to attorney fees incurred at trial and on appeal. [Citations.]" (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 250 (*Barnhart*); *Del Cerro Mobile Estates v. Proffer* (2001) 87 Cal.App.4th 943, 951.) Courts have awarded under Code of Civil Procedure section 1021.5 attorney fees

19

incurred on an appeal, even though that statute does not expressly state that the prevailing party is entitled to attorney fees on appeal. (*Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 927, 928, fn. 5; *Serrano v. Unruh* (1982) 32 Cal.3d 621, 637, 639.)

Therefore, on remand, the trial shall determine the amount of attorney fees reasonably incurred in defending this appeal, and include that amount in its order awarding Mitracos attorney fees. (*Barnhart, supra*, 211 Cal.App.4th at p. 250.)

## DISPOSITION

The matter is remanded to the trial court to determine the amount of attorney fees Mitracos reasonably incurred in defending against this appeal and include that amount in the fees award under Code of Civil Procedure section 1021.5. The judgment is otherwise affirmed. Mitracos shall also recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                         /s/
                                   RAYE, P. J.


We concur:


   /s/
BLEASE, J.


   /s/
KRAUSE, J.