Filed 2/23/26 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LOUIS NAVELLIER et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>DONALD PUTNAM et al.,<br><br>    Defendants and Respondents. | A172077<br><br>(City & County of San Francisco Super. Ct. No. CGC-19-574779)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

It is ordered that the opinion filed herein on February 2, 2026, be modified as follows:

1.    In the first full paragraph on page 7, modify the citation after the last sentence to the following:

    (*Ritchie Capital Management, L.L.C. v. Jeffries* (8th Cir. 2011) 653 F.3d 755, 762 (*Ritchie*).)

2.    In the last full paragraph on page 7, add the following after the last sentence:

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts B, C, and D of the Discussion.

1

In their petition for rehearing, defendants now appear to suggest that NAI's listing of the attorney fee award as an undisputed liability in its bankruptcy petition somehow mitigates or excuses their failure to comply with rule 21. But that listing of the fee award arguably should have suggested to counsel that the bankruptcy "could cause" a stay because there would be no need to waste NAI's resources on an appeal of a fee award it did not dispute. (See *Ritchie, supra*, 653 F.3d at p. 762.)

3. Modify footnote 6 on page 10 to the following:

As noted above, NAI listed the attorney fee award as undisputed in its bankruptcy petition. By doing so, NAI, "in effect, acknowledged the fullness and fairness of" that award. (*In re Deb* (Bankr. N.D.N.Y. May 11, 2012) [nonpub. opn.] 2012 WL 1664235.)

There is no change in the judgment.

Respondents' February 17, 2026 petition for rehearing is denied.

CHOU, J.

We concur.

JACKSON, P. J.
SIMONS, J.

*Navellier v. Putnam*/ A172077

*Navellier v. Putnam* (A172077)

Trial Court:     Superior Court of the City and County of San Francisco

Trial Judge:     Kathleen A. Kelly, etc.

Counsel:         Law Office of Samuel Kornhauser and Samuel Kornhauser for Plaintiffs and Appellants.

                 Tuttle Law Group, Therese Cecile Tuttle for Defendant and Respondent Donald Putnam. Walton & Walton, Lewis Richard Walton Jr. for Defendant and Respondent Grail Partners, LLC.

Filed 2/2/26 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

<table>
<tr><td>

LOUIS NAVELLIER et al.,

     Plaintiffs and Appellants,

v.

DONALD PUTNAM et al.,

     Defendants and Respondents.

</td><td>

A172077

(City & County of San Francisco
Super. Ct. No. CGC-19-574779)

</td></tr>
</table>

Our local rules require that all parties promptly notify us about a bankruptcy that could affect our ability to decide an appeal. Despite this requirement, the parties in this case waited over four months after the filing of a bankruptcy petition by plaintiff Navellier and Associates, Inc. (NAI) and just two days before oral argument to tell us about that petition. Exacerbating the potential consequences of this delay, plaintiffs Louis Navellier and NAI now contend that the automatic bankruptcy stay precludes us from deciding this appeal. (11 U.S.C. § 362(a)(1).) If plaintiffs are correct, then the parties' failure to provide timely notice of the bankruptcy would have caused this court to squander its valuable time and resources. Fortunately, plaintiffs are not correct because Navellier did not file for bankruptcy and because NAI, the debtor, brought this action.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts B, C, and D of the Discussion.

Although the harm to this court caused by the parties' violation of our local rules is therefore minimized, this does not excuse their misconduct. Although we do not sanction the parties, we do admonish them and advise them to learn and follow our local rules in the future.

As for the contentions raised in plaintiffs' appeal from a judgment in favor of defendants Donald Putnam and Grail Partners, LLC (Grail) following a jury trial on plaintiffs' breach of contract and fraud claims, we reject them. Plaintiffs contend that the trial court prejudicially erred in failing to give their proposed special jury instructions on contract formation. We disagree because plaintiffs' opening brief failed to support this contention with adequate reasoning or citations and because there was no prejudice.

Plaintiffs also contend that the trial court's award of attorney fees to defendants should be reversed because: (1) the contract plaintiffs sued on did not contain a fee provision; and (2) the fee award was excessive and unreasonable. We are unpersuaded and affirm.

## I. BACKGROUND

A. Facts

Plaintiffs provided subadvisory investment services to FolioMetrix, an investment advisory firm founded by Jerry Murphey and Greg Rutherford. Between 2013 and 2014, Navellier loaned FolioMetrix $1.5 million "via three separate $500,000 capital injections." The loans were personally guaranteed by Murphey and Rutherford through a promissory note they executed in December 2013.[1] Plaintiffs also provided subadvisory investment services to another investment advisory firm, American Independence. Grail and its

---

[1] The promissory note only covered $1 million of the $1.5 million loaned by Navellier because he did not send the remaining $500,000 to FolioMetrix until April 2014.

managing partner, Putnam, were involved with both FolioMetrix and American Independence and proposed merging the two to form a new company called RiskX.

In March 2015, Navellier and Putnam met in New York to discuss the merger and Navellier's role in providing investment advice to RiskX. At this point, Murphey and Rutherford had not repaid any portion of Navellier's $1.5 million loan. According to Navellier, Putnam said during the meeting that he "wanted to relieve [Murphey and Rutherford] of their [loan] obligations" and "would take [the liability] on." After the meeting, Navellier e-mailed Craig Cognetti, an officer at Grail, to congratulate him on the merger. Navellier noted that "[o]n the FolioMetrix books, it should show that I loaned [Murphey and Rutherford] $1.5 million . . . before Grail . . . took control." Cognetti responded that "one of my priorities over the next few weeks is to make sure the balance sheet of Foliometrix is in order, this includes your loan." Putnam, who was copied on the e-mail, responded that "[b]efore the transaction closes we intend that [the debt] be correctly recorded at the Company, and therefore the individuals will get out of the middle."[2]

By August 2015, Putnam had a falling out with Rutherford and told Navellier in a voicemail that Rutherford "is out." Navellier understood this to mean that Rutherford "would not be a part of the combined entity." With respect to the promissory note, Putnam continued, "I would like to assume the company and relieve [Murphey and Rutherford] of the obligations. In [Rutherford's] case, only if he goes along with the merger."

In early September 2015, Navellier became concerned that Putnam

---

[2] When Grail acquired FolioMetrix, its balance sheet showed two loans from Murphey and Rutherford, rather than Navellier, for $750,000 each.

would not repay the $1.5 million that Navellier had loaned to Murphey and Rutherford and sent Putnam a draft promissory note and pledge agreement to sign. Putnam refused and responded, "Are you kidding? Why would I ever do this? [¶] Right now, [Navellier] has $750[K] loaned to [Murphey] and $750[K] loaned to [Rutherford] . . . [¶] . . . We will find a way to get [Murphey] funds because we like him, but we are determined to screw [Rutherford] in any way we can." Neither Putnam nor Grail repaid Navellier any portion of the $1.5 million he loaned to Murphey and Rutherford.

B. <u>Trial and Attorney Fees</u>

In March 2019, plaintiffs sued defendants for breach of contract, fraud, negligent misrepresentation, and breach of the covenant of good faith and fair dealing. For the breach of contract cause of action, plaintiffs' complaint referenced Navellier's loan to Murphey and Rutherford and alleged that in March 2015, defendants "entered into a written agreement whereby they agreed to assume and repay [plaintiffs] the $1.5 [m]illion in loans plus interest." In addition to that $1.5 million, the complaint sought "accrued interest from December 30, 2013 to judgment at the rate of 10% per annum as provided in the promissory notes assumed by Plaintiffs."

At trial, Navellier testified that Putnam agreed to assume the obligations of the promissory note and to abide by *all* the terms of that note. According to Navellier, Putnam's e-mail confirmed "that [he] was taking over [Rutherford's] and [Murphey's] liabilities" under the loans.

Putnam, however, testified that he did not agree to assume any obligations under the note and that Navellier only requested that his loan be properly recorded on FolioMetrix's books, to which Putnam agreed. Putnam continued that his comment about getting Murphey and Rutherford "out of

4

the middle" simply meant that the new company would be "exchanging two loans from its officers for one loan on the same terms" with Navellier. Cognetti also testified that Putnam and Grail "never agreed to assume any liability" and only wanted to replace the loans from Murphey and Rutherford to FolioMetrix with a loan directly from Navellier to FolioMetrix.

The jury returned a verdict in favor of defendants. It found that the parties did not enter into a contract and that defendants did not promise to repay plaintiffs for the loans. Following trial, defendants sought $373,885.71 in attorney fees (and costs) pursuant to Civil Code section 1717.[3] This amount included the time of five attorneys. The motion relied on the attorney fee provision in the promissory note executed by Murphey and Rutherford. Plaintiffs opposed, arguing that the contract they sued upon was not the note but the parties' March 2015 agreement, and that the amount of fees requested was excessive and unreasonable. The trial court excluded the time of two of the five attorneys and awarded $317,960.96 in fees to defendants. Plaintiffs timely appealed.

## II. DISCUSSION

### A. Bankruptcy Stay

Under rule 21 of our local rules, "*[a]ny* party to a matter pending before this court who is aware of a bankruptcy that *could cause* or impose a stay of proceedings in this court *must promptly* give notice of such bankruptcy." (Ct. App., First Dist., Local Rules of Ct., rule 21(a), italics added.)[4] That notice "*shall* include (1) a copy of the most recent order of the bankruptcy court and of any stay order issued by that court and (2) an

---

[3] All further statutory references are to the Civil Code unless otherwise specified.

[4] All rule references are to the Local Rules of the First District Court of Appeal unless otherwise specified.

5

explanation of whether a stay order or an automatic stay is in effect and why the stay applies to the pending appeal or writ proceeding." (Rule 21(b), italics added.) Despite these requirements, *no* party in this case complied with rule 21. Fortunately, however, the automatic bankruptcy stay (11 U.S.C. § 362(a)(1)) does not preclude us from disposing of this appeal; thereby, mitigating much of the harm that could have resulted from the parties' dereliction of their professional duties.

NAI filed its bankruptcy petition on September 5, 2025. Plaintiffs' counsel admitted at oral argument that he knew about the petition soon after NAI filed it and well before he filed the reply brief on October 27, 2025. Despite this, he waited until January 20, 2026, two days before oral argument, to notify us about NAI's bankruptcy. And when he did so, he did not comply with rule 21(b). Instead, he only provided us with the information required by that rule *after* we ordered him to do so. At oral argument, Plaintiffs' counsel pled ignorance of rule 21 and his initial belief, based on the purportedly faulty advice of bankruptcy counsel, that NAI's bankruptcy did not stay this appeal. But neither excuse absolves him.

First, "[a]s an officer of the court," he "bore professional responsibility to be aware of and knowledgeable about local court rules." (*Massie v. AAR Western Skyways, Inc.* (1992) 4 Cal.App.4th 405, 408.)

Second, rule 21(a) required the parties to provide notice of any bankruptcy that "*could* cause or impose a stay of" this appeal. (Italics added.) Thus, the parties had to provide this court with notice of NAI's bankruptcy if there was *any possibility*, however remote, that it stayed this appeal. (See Dictionary.com (2026) <https://www.dictionary.com/browse/could> [as of February 2, 2026] ["could" is "used to express possibility"].) As evidenced by plaintiffs' claim at oral

6

argument that NAI's bankruptcy did stay this appeal due to defendants' claim for prevailing party attorney fees, that possibility undoubtedly existed here.

That plaintiffs' counsel may have consulted with a bankruptcy attorney who advised him that NAI's bankruptcy did not stay this appeal does not excuse his failure to comply with rule 21. Because rule 21(b) requires that the notice explain whether the "stay applies to the pending appeal," a party to an appeal necessarily has a duty under rule 21(a) to notify this court of a bankruptcy that "could" affect the appeal even if that party does not believe that it would. In any event, where, as here, a *party to an appeal* has filed for bankruptcy, common sense dictates that the bankruptcy "could cause . . . a stay" of the appeal; thereby, triggering a duty to notify this court under rule 21. Indeed, a bankruptcy court may "stay actions against any party, even a non-debtor, whenever the objective of the action is to obtain possession or exercise control over the debtor's property." (*Ritchie Capital Management, L.L.C. v. Jeffries* (8th Cir. 2011) 653 F.3d 755, 762.)

Defendants' counsel also acquitted themselves poorly. After some prodding at oral argument, Grail's counsel eventually admitted that he learned about NAI's bankruptcy a couple of months before oral argument. In an apparent attempt to justify his failure to comply with rule 21, he also proffered one of the inadequate excuses proffered by plaintiffs' counsel: that he believed, after consulting with a bankruptcy attorney, that the automatic bankruptcy stay did not affect this appeal.[5] (11 U.S.C. § 362(a)(1).)

To their credit, all counsel did, for the most part, accept responsibility for the parties' failure to comply with rule 21. For this reason, we decline to

---

[5] Putnam's counsel did not offer any explanation at oral argument for her failure to comply with rule 21.

7

impose any sanctions at this time.  (But see *Keitel v. Heubel* (2002) 103 Cal.App.4th 324, 340 (*Keitel*) [imposing sanctions due in part to the parties' failure to notify the court about a bankruptcy in violation of a local rule].)  Instead, we admonish counsel to comply with our local rules in the future and to "promptly" notify us if a bankruptcy petition has been filed by one of the parties so we do not waste our limited time and resources.  (Rule 21(a).)  Indeed, even though we, as explained below, may resolve this appeal notwithstanding NAI's bankruptcy, the parties' failure to promptly notify us about that bankruptcy still forced us to issue orders that should not have been necessary and to waste time and resources discussing their failure to comply with rule 21 at oral argument and in this opinion.

Turning to the impact of the automatic bankruptcy stay (11 U.S.C. § 362(a)(1)), we reject plaintiffs' contention that the stay precludes us from deciding this appeal.

First, the stay does not affect the appeal by Navellier because he has not filed for bankruptcy.

Second, the stay does not affect the appeal by NAI because it brought this action against defendants.  "When a bankruptcy debtor is a party in an appeal, the court must decide whether the appeal is a 'commencement or continuation' of an 'action or proceeding against the debtor.' " (*Keitel*, *supra*, 103 Cal.App.4th at pp. 332–333.)  The relevant inquiry "is whether the *original* proceeding, i.e., the underlying action, was brought against the debtor." (*Id.* at p. 333; see *Shah v. Glendale Fed. Bank* (1996) 44 Cal.App.4th 1371, 1377 (*Shah*).)  Here, NAI sued defendants.  Thus, the stay does not apply to this appeal, "regardless whether the debtor is the appellant or the respondent." (*Shah*, at p. 1377 ["whether an action is 'against the

debtor' within the meaning of section 362(a)(1) is determined by the debtor's status at the *inception of the action*," italics added].)

The fact that defendants seek to affirm their attorney fee award against NAI under section 1717 makes no difference. Indeed, a "statutory fee motion 'does not create a new cause of action . . .' [citation], much less a new 'action.' It is a collateral matter, ancillary to the main cause." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 636–637.) The fee award is therefore "embraced in the action" brought by plaintiffs. (*Bankes v. Lucas* (1992) 9 Cal.App.4th 365, 369.) Accordingly, NAI's appeal from the fee award in an action it originally brought is not subject to the automatic bankruptcy stay. (See *In re Horizon Womens Care Prof. LLC* (Bankr. D.Colo. 2014) 506 B.R. 553, 556 [stay did not preclude resolution of appeal from attorney fees awarded under provision in contract that the plaintiff sued to enforce].)

Plaintiffs' reliance on *Parker v. Bain* (9th Cir. 1995) 68 F.3d 1131 is misplaced. There, the Ninth Circuit held that an appeal from a judgment awarding damages and attorney fees on the defendant's *counterclaim* against the debtor is subject to the automatic bankruptcy stay. (*Id.* at p. 1137.) The court reasoned that the counterclaim was, " 'at its inception,' [citation], an action against [the debtor]." (*Ibid.*) By contrast, defendants filed no claims against NAI, and their fee award arises solely out of NAI's own breach of contract claim against defendants. Because the stay is not "applicable . . . to actions *brought by* the debtor," it does not prevent us from

9

deciding this appeal brought by NAI.[6]  (*Shah*, *supra*, 44 Cal.App.4th at p. 1376.)

B.  Special Jury Instructions

As for the appeal itself, plaintiffs contend that they were prejudiced by the trial court's refusal to give the special jury instructions they requested on contract formation.  We need not reach the merits of this contention because plaintiffs failed to provide adequate argument or citations in the opening brief to support their claim of instructional error.  But even if we did reach the merits, we would find no prejudice.

1.  *Waiver*

An appellant has the burden of demonstrating error in its opening brief through legal analysis supported by citations to authority and the record. (*Thee Aguila, Inc. v. Century Law Group, LLP* (2019) 37 Cal.App.5th 22, 30–31.)  A " 'bare assertion of error' " is insufficient.  (*Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1207.)  "When an appellant raises an issue 'but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' "  (*Ibid*.)  With respect to a claim of failure to instruct, mere assertions that the trial court erred without explaining how are insufficient. (*Batchelor v. Caslavka* (1954) 128 Cal.App.2d 819, 823.)

Plaintiffs argue that the trial court's refusal to give at least 14 special instructions they proffered "caused the jury to be confused and misled into believing that there had to be a single, formal, written agreement."  But their opening brief did not provide the language of any of these instructions or explain why the instructions given were inadequate.  Indeed, plaintiffs

---

[6] We further note that NAI listed the attorney fee award obtained by defendants as undisputed in its bankruptcy petition.  By doing so, NAI, "in effect, acknowledged the fullness and fairness of" that award.  (*In re Deb* (Bankr. N.D.N.Y. May 11, 2012) [nonpub. opn.] 2012 WL 1664235.)

10

did not cite *any* authority to support their argument. Instead, they asserted, without citing to the record, that the rejected instructions were necessary because defense counsel "kept misleading [the jury] and arguing that there was no written contract." They also asserted, without providing any reasoning or citations to authority or the record, that the instructional error was "highly prejudicial."

Plaintiffs did, to some extent, flesh out the arguments in support of their claim of instructional error in the reply brief. But this was too little, too late. " ' "Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it." ' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.)

### 2. *Prejudice*

Even if we considered the arguments raised in the reply brief, we would find no prejudicial error. "A judgment may not be reversed for instructional error in a civil case" absent prejudice. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) An instructional error "is [only] prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Ibid.*) In making this determination, we evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581.)

In their reply brief, plaintiffs argue that the trial court erred by refusing to give special jury instructions (Special Instructions) Nos. 4, 9, 15, and 16, all of which concerned contract formation.[7] Plaintiffs contend that

---

[7] Special Instruction No. 4 states that oral agreements and/or conduct creates a binding contract even if a party "fails or refuses to sign a formal agreement." Special Instruction No. 9 states that "[a]n informal agreement is not invalid merely because it does not contain [super-technical] provisions."

these instructions would have "corrected [defense counsel's] false misstatements" that there was no contract absent a written document signed by Putnam. We are unpersuaded.

Even assuming defense counsel misstated the law on contract formation, the trial court instructed the jury that counsel's statements are *not* the law. Instead, the court told the jury that it must follow the law as stated in the instructions given by the court. Those instructions correctly informed the jury that a contract may "be written or oral" (CACI No. 304), that a contract may be created by the conduct of the parties (CACI No. 305), and most notably, that a contract may be formed without a final written agreement signed by the parties (CACI No. 306). "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803–804.) We have no reason to believe that the jury disregarded the instructions given by the court, and plaintiffs identify none.

Nonetheless, plaintiffs contend that certain questions submitted by the jury during its deliberations establish prejudice. But those questions indicate that the jury was focused on what, if anything, the parties actually agreed upon and not whether any oral statements or conduct were sufficient to establish an enforceable contract. For example, the jury asked, "If Putnam promised 'A' and Navellier heard he was promised 'B[,]' should we consider that a promise was made if the two parties disagree on what was promised?" The jury also asked why Navellier waited six months after

---

Special Instruction No. 15 explains when an informal memorandum satisfies the statute of frauds. And Special Instruction No. 16 states that "[a] typewritten signature at the end of an email satisfies the statute of frauds."

12

Putnam purportedly agreed to assume the note to send the September 2015 draft promissory note: "If the terms stayed consistent why not send Putnam the papers to sign ASAP?" Because the jury's questions focused on the potential *terms*, rather than the formation, of any agreement, we do not find it probable that the failure to give the special instructions prejudicially affected the verdict.

C. <u>Attorney Fee Provision</u>

Plaintiffs next contend that the award of attorney fees should be reversed because plaintiffs did not sue on the promissory note with the attorney fee provision. Instead, they contend that they sued on the March 2015 "oral/emails/course of conduct contract" between the parties, which had no fee provision. We disagree. The allegations in the complaint, together with the evidence presented at trial, support the trial court's conclusion that plaintiffs sought to enforce the note.[8]

1. *Law and Standard of Review*

Under section 1717, the "prevailing" party "[i]n *any action on a contract*" with an attorney fee provision "shall be entitled to reasonable attorney's fees in addition to other costs." (Italics added.) We liberally construe the phrase " 'action on a contract.' " (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 240 (*Barnhart*).) Thus, an action is "on the contract" so long as it "relates to an agreement by seeking to . . . determine or enforce a party's rights or duties under the agreement." (*Id.* at p. 242.)

---

[8] We disregard *CP III Rincon Towers, Inc. v. Assessment Appeals Bd. of San Francisco* (Dec. 17, 2019, A155714) [nonpub. opn.]—which was cited by plaintiffs—and remind their counsel that unpublished opinions are not citable except in circumstances not applicable here. (Cal. Rules of Court, rule 8.1115.)

"The primary purpose of section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610.) As a result, "it has been consistently held that when a party litigant prevails in an action on a contract by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent, section 1717 permits that party's recovery of attorney fees whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed." (*Id.* at p. 611.)

"On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion." (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142.) But where the question is "not what the contract at issue *means*, but what that contract *is*" and the evidence was conflicting, the "standard of review is the substantial evidence test rather than an independent interpretation of the contract." (*Brittalia Ventures v. Stuke Nursery Co., Inc.* (2007) 153 Cal.App.4th 17, 23 (*Brittalia*).)

### 2. *Analysis*

Substantial evidence supports the trial court's finding that plaintiffs sought to enforce the 2013 promissory note in their breach of contract cause of action.

First, the allegations in plaintiffs' complaint support this finding. (*Hyduke's Valley Motors v. Lobel Financial Corp.* (2010) 189 Cal.App.4th 430, 435 (*Hyduke's*) [relevant factors in determining whether an action was " ' "on a contract" ' " include "the theories asserted"].) That complaint expressly referenced the $1.5 million loan plaintiffs made to Murphey and Rutherford and alleged that in March 2015, defendants "entered into a written agreement whereby they agreed to *assume* and repay to [plaintiffs] the $1.5 [m]illion in loans plus interest." (Italics added.) The complaint also

14

sought as damages the "accrued interest from December 30, 2013 to judgment at the rate of 10% per annum *as provided in the promissory notes*." (Italics added.) Thus, the complaint not only alleged that defendants agreed to assume the note in March 2015, it also alleged that they were bound by the terms of that note—which necessarily included the attorney fee provision. (See *Wilson's Heating & Air Conditioning v. Wells Fargo Bank* (1988) 202 Cal.App.3d 1326, 1334 [a nonsignatory's "express assumption of the contract or an acceptance of the [contract's] benefits" is required in order to obligate it to the contract's terms].)

Second, the evidence plaintiffs presented at trial bolsters this conclusion. (*Hyduke's*, *supra*, 189 Cal.App.4th at p. 435 [relevant factors in determining whether an action was " ' "on a contract" ' " include "the evidence produced at trial"].) For example, Navellier testified that at the March 2015 meeting, Putnam agreed to assume Murphey's and Putnam's obligation under the promissory note to repay Navellier for his loan. Plaintiffs' counsel then asked Navellier to review the note and asked him whether it laid out "the terms of repayment of the loan." Navellier confirmed that it did and stated that defendants agreed to "*assum[e] these terms*." (Italics added.) Plaintiffs' counsel then confirmed with Navellier that these terms included "a provision about attorney[ ] fees in the event of default in this loan that [defendants] were assuming."

After defendants moved for attorney fees following the verdict, plaintiffs attempted to dissociate their breach of contract claim from the promissory note. Plaintiffs now contend that defendants only agreed "to pay Navellier $1.5 [m]illion to be the investment advisor to the RiskX funds." But this contention is contradicted not only by the allegations in the complaint and the trial evidence but also by plaintiffs' stipulation that they

15

"are not making a claim for payment of investment advisory fees." Indeed, plaintiffs pled and argued throughout trial that defendants agreed to assume Murphey's and Rutherford's debt in accordance with the terms of the promissory note.

*Barnhart, supra*, 211 Cal.App.4th 230 is instructive. There, the plaintiff, a general contractor, solicited a bid from the defendant, a subcontractor. (*Id.* at p. 234.) That bid included an attorney fee provision. (*Id.* at p. 235.) Although the plaintiff never signed the defendant's bid, it used that bid in preparing its own bid for a project. (*Id.* at p. 234.) Ultimately, the parties were unable to agree on a subcontract. (*Id.* at pp. 234–235.) The plaintiff then sued the defendant for breach of contract, alleging that the plaintiff had accepted the defendant's bid but the defendant refused to perform the work. (*Id.* at p. 235.) After the plaintiff lost at trial, it tried to "escape the effect of section 1717 by arguing it did not sue to enforce the terms of [the defendant's] bid." (*Id.* at p. 238.) Instead, the plaintiff argued that it sued to enforce a subcontract "which was not a 'specific written document' but an agreement 'the terms and conditions of [which] "were to be memorialized in a more formal agreement." ' " (*Ibid.*) The Court of Appeal rejected this argument, reasoning that "the terms of the alleged [subcontract] that [the plaintiff] sought to enforce . . . were necessarily those of [the defendant's] bid because [the plaintiff] defined the [subcontract] as the contract formed by acceptance of that bid." (*Ibid.*, italics omitted.) Similarly, plaintiffs sought to enforce the terms of the promissory note and steadfastly asserted that defendants agreed to assume that note.

Plaintiffs' reliance on *Brittalia, supra*, 153 Cal.App.4th 17, is unavailing. There, the Court of Appeal reversed an award of attorney fees in favor of the plaintiff because the contract it sought to enforce "through

16

bringing this action . . . [did] not contain any attorney fee provision." (*Id.* at p. 29.) By contrast, plaintiffs sought to enforce the terms of a contract (the promissory note) that did contain an attorney fee provision.

In any event, the reasoning of *Brittalia* supports the attorney fee award in this case. As the Court of Appeal explained, it would be unfair to allow the plaintiff "to win on its contact action by championing one contract without an attorney fee provision, and then turn around and ask for attorney fees as prevailing party based on a different contract, with an attorney fee provision." (*Brittalia, supra,* 153 Cal.App.4th at p. 31.) This case presents the converse situation. Plaintiffs cannot seek to enforce the terms of the promissory note, under which they would have been entitled to attorney fees if they had prevailed, but then deny that they sued upon that note after losing at trial in order to escape liability for any fees.

Accordingly, there is more than enough evidence to support the trial court's finding that defendants are entitled to recover their attorney fees because plaintiffs sued to enforce the promissory note.

D. <u>Attorney Fee Amount</u>

Lastly, plaintiffs contend that even if defendants were entitled to attorney fees, the award of $317,960.96 in fees was excessive and unreasonable. We disagree. As evidenced by its reduction of the requested fees because the work of two of defendants' attorneys was unjustified, the trial court properly exercised its discretion in awarding fees to defendants.

1. *Law and Standard of Review*

An attorney fee award is calculated using the lodestar method. Under that method, the trial court " 'first multipl[ies] the number of hours reasonably expended on the litigation by a reasonable hourly rate of compensation.' " (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th

17

691, 697.) "The amount of an attorney fee to be awarded is a matter within the sound discretion of the trial court." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134 (*Akins*).) "Accordingly, there is no question our review must be highly deferential to the views of the trial court." (*Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1239.) At the same time, discretion "may not be exercised whimsically, and reversal is required where there is no reasonable basis for the ruling or when the . . . court has applied the wrong test to determine if the statutory requirements were satisfied." (*Flannery v. Cal. Highway Patrol* (1998) 61 Cal.App.4th 629, 634.)

2. *Analysis*

In their motion for attorney fees, defendants explained that shortly before the start of trial, they had incurred "only $8,733 in legal fees." At the time of trial, however, defendants' long-time counsel, Iain MacDonald, was retiring. MacDonald therefore brought in Brian Kandel as lead trial attorney for Grail. Kandel, however, was unavailable for part of the trial, so his colleague, L. Richard Walton, was brought in to try the case on behalf of Grail.[9] MacDonald also brought in a fourth attorney, Therese Tuttle, to represent Putnam individually because of the possibility of a conflict between his interests and Grail's interests. A fifth attorney, Maxim Vaynerov, joined defendants' trial team near the close of trial to assist with some "unique legal issues" and motions. MacDonald also billed for his time attending the trial because he was the only attorney familiar with the case's lengthy history.

The trial court concluded that "it was reasonable for defense to have three trial counsel, given potential conflicts between . . . Putnam and Grail

---

[9] In his supporting declaration, Walton claimed that he "worked over 20-hour days initially" to get up to speed for trial. He incurred the main share of the requested attorney fees—approximately $195,325.

18

. . . , and the fact that [MacDonald] had been trial counsel for many years leading up to his impending retirement just before trial." After "careful consideration" of counsels' declarations, the court held that the rates charged by MacDonald, Walton, and Tuttle were reasonable. The court however, found that it was excessive for defendants to have *five* attorneys "on a case of this nature" and denied all of Vaynerov's and Kandel's requested fees, which totaled $64,640. The court further excluded the hours spent by the three approved counsel discussing the case with Vaynerov or Kandel. After deducting those hours, the court awarded defendants $317,960.96 in fees, approximately 15% less than the requested amount.

We find no abuse of discretion. The trial court "is the best judge of the value of professional services rendered in its court" and "we will not disturb that determination unless we are convinced that it is clearly wrong." (*Akins, supra,* 79 Cal.App.4th at p. 1134.) Indeed, "[t]he only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination." (*Ibid.*) Here, the fee award was reasonable given MacDonald's pending retirement and the need for two new counsel to get up to speed so they could separately represent Putnam and Grail at trial.

## III. DISPOSITION

The judgment and order granting defendants' motion for attorney fees are affirmed.

CHOU, J.

We concur.

JACKSON, P. J.
SIMONS, J.

19

*Navellier v. Putnam* (A172077)

Trial Court:        Superior Court of the City and County of San Francisco

Trial Judge:        Kathleen A. Kelly, etc.

Counsel:                Law Office of Samuel Kornhauser and Samuel Kornhauser for Plaintiffs and Appellants.

                           Tuttle Law Group, Therese Cecile Tuttle for Defendant and Respondent Donald Putnam. Walton & Walton, Lewis Richard Walton Jr. for Defendant and Respondent Grail Partners, LLC.